UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSELINE A. CANO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:19-cv-11563-ADB |
| | * | |
| ANDREW SAUL, | * | |
| *Commissioner of Social Security*, | * | |
| | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Joseline A. Cano ("Claimant") brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. Currently pending are Claimant's motion to reverse or remand the Commissioner's decision denying her disability benefits, [ECF No. 12], and the Commissioner's cross-motion for an order affirming the decision, [ECF No. 15]. For the reasons described herein, Claimant's motion to reverse and remand is <u>GRANTED</u> in part and the Commissioner's motion to affirm is <u>DENIED</u>.

I.    **BACKGROUND**

A.    **Statutory and Regulatory Framework**

1.    <u>Five-Step Process Used by the ALJ to Evaluate Disability Claim</u>

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for

the indigent aged and disabled."   Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42

U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be

"disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or that has lasted or can be expected to last for a continuous period of not less
> than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A).  The disability must be severe,

such that the claimant is unable to do his or her previous work or any other substantial gainful

activity that exists in the national economy.  See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R.

§ 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step

process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be
> concluded at any step along the process.  The steps are: 1) if the applicant is engaged
> in substantial gainful work activity, the application is denied; 2) if the applicant
> does not have, or has not had within the relevant time period, a severe impairment
> or combination of impairments, the application is denied; 3) if the impairment
> meets the conditions for one of the "listed" impairments in the Social Security
> regulations, then the application is granted; 4) if the applicant's "residual functional
> capacity" is such that he or she can still perform past relevant work, then the
> application is denied; 5) if the applicant, given his or her residual functional
> capacity, education, work experience, and age, is unable to do any other work, the
> application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

2.    Appeals Council Review

Claimants dissatisfied with an Administrative Law Judge's ("ALJ") decision may request

that the Appeals Council review the action.  20 C.F.R. § 416.1467.  The Appeals Council may

deny or dismiss the request for review, or it may grant the request and either issue a decision or remand the case to an ALJ.  Id.  The Appeals Council will review a decision if:

> (1) [t]here appears to be an abuse of discretion by the administrative law judge; (2) [t]here is an error of law; (3) [t]he action, findings or conclusions of the administrative law judge are not supported by substantial evidence; (4) [t]here is a broad policy or procedural issue that may affect the general public interest; or (5) [s]ubject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and if there is a reasonable probability that the additional evidence would change the outcome of the decision.

20 C.F.R. §§ 416.1470(a), 404.970(a)[1, 2].  When reviewing decisions, the Appeals Council will only consider additional evidence under subsection 20 C.F.R. § 416.1470(a)(5) if the claimant shows good cause including, for example, because "[the claimant] had a physical, mental, educational, or linguistic limitation(s) that prevented [them] from informing [the SSA] about or submitting the evidence earlier."  20 C.F.R. §§ 416.1470(b), 404.970(b).

If the Appeals Council denies a claimant's request for review of an ALJ's decision, the ALJ's decision becomes the final decision of the Commissioner and is subject to review by a district court.  See Conte v. McMahon, 472 F. Supp. 2d 39, 44 (D. Mass. 2007).

### B.      Procedural Background

Claimant filed her applications for SSI and SSDI benefits on February 4, 2016.  [R. 99].[3] She alleged that she became disabled on July 21, 2015, due to shoulder pain, body numbness, a

---

[1] Amendments to 20 C.F.R. § 416.1470 and the textually identical § 404.970 made effective in January 2017 added an additional requirement that claimants demonstrate a reasonable probability that the additional evidence would change the outcome of the decision in order for the submission of additional evidence to trigger Appeals Council review.

[2] The text of 20 C.F.R. §§ 404.970 and § 416.1470 are identical. Section 404 regulates SSI benefits and § 416 regulates SSDI benefits.

[3] References to pages in the Administrative Record, which were filed electronically at ECF No. 11, are cited as "[R. __ ]."

gastrointestinal polyp, a hiatal hernia, panic attacks, fibromyalgia, heart palpitations, depression, and anxiety.  [R. 163–64, 274].  She can remain insured through December 31, 2020.  [R. 100].

In March 2016, after Claimant filed her applications for benefits, Claimant's medical record was reviewed by Dr. Carol Montgomery, an advising psychologist to the Disability Determination Services ("DDS"), the state agency of the SSA.  [R. 186–93].  Dr. Montgomery made findings that Claimant met criteria for Listing 12.06 (anxiety disorder) with an onset date of July 21, 2015 and was disabled.  [R. 193].  In April 2016, advising psychiatrist Dr. Cal VanderPlate disagreed with Dr. Montgomery's determination, citing insufficient evidence.  [R. 917].  The case was sent back to Dr. Montgomery.  In May 2016, Dr. Montgomery reassessed Claimant's medical history and found that Claimant had fibromyalgia, anxiety disorders, curvature of the spine, and affective disorders, specifically panic disorder with avoidance and depressive disorders.  [R. 207–08].  Upon reevaluation of these impairments, she found that Claimant was not disabled.  [R. 213].  On May 25, 2016, Dr. Mary Connelly, an advising physician to the DDS, determined that Claimant could perform work at the light exertion level. [R. 210–13].  Upon reconsidering Claimant's case in September 2016, Dr. Lucinda Wheelock, an advising physician to the DDS, concurred with Dr. Connelly's assessment that Claimant was not disabled.  [R. 237–39].

The Social Security Administration (the "SSA") denied Claimant's applications for SSI and SSDI benefits on July 19, 2016, and again upon reconsideration on September 29, 2016.  [R. 259, 271].  On November 15, 2016, Claimant requested an administrative hearing, which took place before ALJ Stephen C. Fulton on August 24, 2017.  [R. 284, 153].  Claimant, who was represented by counsel, appeared and testified at the hearing.  [R. 99].  Vocational Expert Amy

Vercillo ("VE Vercillo") also testified at the hearing.  [Id.].  On October 30, 2017, the ALJ

issued his decision, in which he concluded that Claimant was not disabled.  [R. 128].

### C.      Factual Background

Claimant was fifty years old on the alleged date of onset.  [R. 127].  She attended school

in the Dominican Republic through the eighth grade.  [Id.].  In 1996, she moved from El

Salvador to New Jersey, where she worked in a bag factory and as a housekeeper.  [R. 65].  In

2001, after separating from her husband, Claimant moved to Boston, where she worked in

childcare and as a cashier until 2006.  [R. 393].  From May 2006 to January 2016, she was

employed as a cleaner at Beth Israel Deaconess Medical Center ("BIDMC").  [R. 25, 393].

Claimant stopped working on July 21, 2015, the alleged onset date of her disability, [R. 405],

and received short and long-term disability pay through her employer.  [R. 176–77].  She was on

leave without pay from September 27, 2015 to January 12, 2016.  [R. 355].  On January 11,

2016, BIDMC sent Claimant a letter of termination stating that it could no longer extend her

leave.  [R. 354].  Since the alleged onset date, Claimant has not been gainfully employed.  [R.

163].

### D.      Relevant Medical Evidence

#### 1.      Mental Health Conditions

The Court begins with the medical evidence from around the date of the alleged onset,

which was July 21, 2015.  On that day, as Claimant stated during the hearing, she experienced a

panic attack at work.  [R. 168].  Thereafter, in August 2015, Claimant saw Katie Mukai, AM for

increased anxiety.  [R. 836].  Mukai recommended outpatient therapy.  [R. 836–37].  Claimant

established primary care with Dr. Luke Brindamour in November 2015.  [R. 853].  Claimant

reported that her anxiety had grown worse over the past year and that her depression had made

her feel "off."  [R. 853, 856].  Dr. Brindamour created a course of treatment which included

continuing her existing medications and attending therapy.  [R. 866].

Claimant also began seeing psychiatrist Dr. Jacqueline Roberts in November 2015.  [R.

859].  Dr. Roberts noted Claimant's chief complaint as follows: "I have many physical

symptoms . . . my doctors tell me it's psychological . . . I want my energy back."  [R. 860].  Dr.

Roberts diagnosed Claimant with panic disorder and unspecified depressive disorder.  [R. 859–

66].  She noted that Claimant's former Primary Care Provider ("PCP") had observed that

Claimant was "physically healthy" and that "her mental health . . . require[d] the most care."  [R.

871].  Dr. Roberts concluded that "ultimately the solutation [sic] was psychotherapy, primarily

[cognitive behavioral therapy and activity-based therapy], but that psychopharmacology can also

play a role."  [R. 860].

Claimant began seeing an outpatient psychotherapist, Miluska Garcia-Diaz, LICSW, on

December 2, 2015.  [R. 77].  Garcia-Diaz diagnosed Claimant with Major Depressive Disorder

and gave her a GAF score of 55.[4]  [R. 870].  At her follow-up appointment, Claimant reported

not having energy to do housework or cook and worsening depression, as well as recurrent panic

attacks.  [R. 878–79].  Diaz established the long-term goal for Claimant of establishing ways to

---

[4] The GAF scale

> is used to rate a patient's "overall psychological functioning."  The scale goes from
> "1," indicating that the patient has a persistent danger of severely hurting self or
> others," to "100," indicating "superior functioning."  A score in the range of 51-60
> indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech,
> occasional panic attacks), or moderate difficulty in social, occupational, or school
> functioning (e.g., few friends, conflicts with peers or co-workers)."

Lopez-Lopez v. Colvin, 138 F. Supp. 3d 96, 98 n.4 (D. Mass. 2015) (alteration in original)
(citations omitted) (quoting Am. Psychiatric Inst., Diagnostic & Statistical Manual of Mental
Disorders at 32 (4th ed. 1994)).

cope with panic.  [R. 870].  Claimant saw Dr. Brindamour in December 2015 and reported

feeling mild relief of anxiety during talk therapy.  [R. 872].

Claimant returned to Dr. Brindamour for a follow-up in January 2016 and reported

worsening depression, exacerbated by losing her job.  [R. 880].  Dr. Brindamour put Claimant in

contact with a social worker and a Community Resource Specialist, Katelyn Sullivan.  [R. 884–

85].  In February 2016, Sullivan helped Claimant complete a "Function Report."  [R. 427–434].

Claimant reported starting chores but not finishing them and not spending time with others

except for when her adult son and daughter came to help her around the house.  [R. 428–29].

She also stated that her shoulder and back pain made daily tasks like combing her hair difficult.

[Id.].

2.      Fibromyalgia

In November 2014, Claimant presented at BIDMC's Emergency Department with

weakness, chest pain, dizziness and total body vibration.  [R. 844].  Her test results were normal

and she was discharged.  [R. 844–46].  Two days later, she returned to the emergency room, this

time at Boston Medical Center, reporting chills.  [R. 643].  It was determined that her symptoms

did not suggest any underlying disease.  [R. 643–45].  On January 29, 2015, Claimant went to

BIDMC reporting a headache, chest pain, and intermittent shoulder pain over the past three

months.  [R. 846].  Claimant was discharged after all of her tests were normal.  [R. 846–50].  At

Claimant's initial appointment with Dr. Brindamour in November 2015, he noted, "[patient]

suffers from chronic joint pain, headaches, and abdominal pain.  Although her medical work-up

has been unremarkable, these remain sources of pain for the patient."  [R. 865].

In March 2016, Claimant met with Nurse Practitioner Linda DeBeasi for lower back pain.

[R. 936].  DeBeasi thought that the pain was likely due to a lower back strain and recommended

physical therapy.  [R. 938].  In April 2016, Claimant was diagnosed with fibromyalgia.  [R. 950].

In May 2016, Dr. Roberts noted that Claimant was still experiencing somatic symptoms despite

having predominantly negative medical test results.  [R. 977–79].  In August 2016, Claimant's

PCP referred her to rheumatologist Dr. Jonathan Hausmann for treatment of fibromyalgia.  [R.

1022].  Dr. Hausmann found that her extensive prior imaging results and bloodwork were

"largely normal."  [R. 1025].  He recommended aerobic exercise and prescribed a drug and

physical therapy regimen.  [Id.].  In October 2016, Claimant returned to Dr. Hausmann for pain

and he concluded that her abdominal distress and headaches stemmed from her fibromyalgia.

[R. 1173].  He encouraged her not to seek further diagnostic testing.  [R. 1174].  That same

month, Claimant reported to her physical therapist that she still struggled with self-care and

home management.  [R. 1154].  During the hearing, she stated that tasks like mopping the floor

or carrying a gallon of milk were still too painful for her to undertake.  [R. 175].

### 3. Right Shoulder Dislocation

On August 21, 2016, Claimant fell in her shower and dislocated her right shoulder.  [R.

173, 1030, 1154].  She immediately went to the hospital, where staff performed an X-ray and

relocated her shoulder.  [R. 1154, 961–62].  She was given ibuprofen, instructed to immobilize

the shoulder in a sling, and told to schedule a follow-up appointment with an orthopedist.  [R.

963, 1031].  On August 31, 2016, Claimant saw an orthopedist, Dr. Arun Ramappa.  [R. 1139].

To alleviate her ongoing shoulder pain, Dr. Ramappa prescribed physical therapy.  [Id.].

Claimant attended physical therapy sessions with Rebecca Towers from October 2016 until April

2017.  [R. 1154, 1199, 1213, 1239, 1244, 1264].  In May 2017, Claimant followed up with Dr.

Ramappa for continued pain in her shoulder and he prescribed another course of physical

therapy.  [R. 1273].  Claimant stated that she was not working, not because of her shoulder but because of fibromyalgia and depression.  [Id.].

### 4.   Headaches/Joint Degeneration

Claimant also reported chronic headaches and neck pain in October 2016 and saw Dr. Brindamour to discuss treatment.  [R. 1165].  Dr. Brindamour increased her dose of gabapentin, ordered a CT scan and referred her to a headache clinic and physical therapy.  [R. 1169]. Claimant saw Dr. Hausmann the same month and reported headaches, neck and shoulder pain, and difficulty sleeping.  [R. 1171].  He examined her and found that her neck had full range of motion, her left shoulder and arm were normal, and her strength was intact.  [R. 1173].

In February 2017, Claimant visited a neurologist, Dr. Monica Makhija, for worsening headaches.  [R. 1217–20].  Dr. Makhija started Claimant on Topamax, ordered an MRI of her cervical spine, and discussed ways to improve her sleep.  [R. 1220].  In April 2017, Dr. Brindamour noted that the MRI showed only mild degenerative joint disease and mild foraminal narrowing.  [R. 1255].  Claimant reported that her headaches had become less frequent and less intense.  [Id.].

### E.   ALJ'S Decision

On October 30, 2017, the ALJ issued a decision finding that Claimant was not disabled under Sections 216(i) and 223(d) of the Act.  [R. 128].  The ALJ followed the five-step sequential test for determining whether an individual is disabled.  [R. 100–02].  At step one, he found that Claimant had not engaged in gainful work since the alleged date of onset, July 21, 2015.  [R. 102].  At step two, he determined that Claimant had the following severe impairments: right shoulder supraspinatus tear, scoliosis and mild lumbar degenerative changes, fibromyalgia, depressive disorder, and anxiety disorder.  [R. 102].  After a thorough review of Claimant's

medical history, the ALJ determined that those impairments "significantly limit the ability to perform basic work activities as required by SSR 85-28." [R. 102].

At the step three, the ALJ determined that Claimant "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." [R. 105].[5]  He further explained:

> The claimant's right shoulder impairment has been evaluated under listing 1.02, major dysfunction of a joint. This listing requires evidence of a gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or abnormal motion of the affected joints, with involvement of one major peripheral joint in each upper extremity.  In this case, there is no evidence of any impairment affecting the claimant's left upper extremity.  Therefore, she does not meet or medically equal the criteria of this listing.

> The spinal impairments have been evaluated under listing 1.04, disorders of the spine.  This listing requires evidence of an impairment resulting in compromise of a nerve root or the spinal cord.  There is no imaging or symptoms consistent with compromise of a nerve root or the spinal cord and I find the claimant does not meet or medically equal the criteria of this listing.

> The severity of the Claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the 'paragraph B' criteria are satisfied.

[R. 105 (citations omitted)].  The ALJ then analyzed the Paragraph B criteria of Listings 12.04 and 12.06.  [R. 105].  In understanding, remembering, and applying information, the ALJ found Claimant had a moderate limitation.  The ALJ found that "[t]he claimant's impairments affected her memory and understanding. She could follow written instructions, but how long was

---

[5] The ALJ did not evaluate whether Claimant met the requirements of Listing 12.05 (intellectual disability).

questionable.  She could follow spoken instructions if it was a simple one or two-step instruction that was written down."  [R. 106].  On this first paragraph B criterion, the ALJ concluded that

> [C]laimant has demonstrated the ability to understand, remember and apply both simple and complex information in the setting of her medical care.  While I agree with Dr. Montgomery and Dr. Maliszewski that she has no limitations in understanding and memory, I also agree that her ruminative thinking will affect her ability to perform complex tasks.  I therefore find that the claimant is able to understand and remember simple instructions.

[Id.].

The ALJ found Claimant had moderate limitations in interacting with others.  [R. 106].  The ALJ also found that Claimant had a moderate limitation in concentrating, persisting or maintaining pace.  [R. 107].  On this criterion, he concluded that

> [t]he record shows that the claimant is able to concentrate, persist and maintain pace at a variety of tasks, but her anxiety regarding her physical pain would distract her such that she would have difficulty with detailed or complex tasks.  I have therefore given great weight to the assessment by the advisors in finding claimant is able to concentrate for 2-hour periods over an 8-hour day on simple tasks.

[R. 108].  The ALJ found that Claimant had a mild limitation in adapting or managing herself.  [Id.].  Thereafter, the ALJ analyzed the record against the paragraph C criteria and determined that Claimant did not meet them.  [R. 109].

At step four, the ALJ made the following findings on Claimant's Residual Functional Capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404 1567(b) and 416.967(b) except she can only occasionally climb, balance, stoop, kneel and crouch, with a need to avoid climbing using ladders, ropes and scaffolds and crawling.  She needs to avoid pushing or pulling with her dominant right upper extremity.  She can understand and remember simple instructions and concentrate for 2-hour periods over an 8-hour day on simple tasks.  She can interact appropriately with coworkers and supervisors but should avoid work that requires frequent contact with the general public.  She can adapt to changes in the work setting.

[R. 109].  The ALJ ultimately found that Claimant was unable to perform past relevant work. [R. 127].

At step five, the ALJ determined that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform i.e., small product packer and sorter, assembler of small products, and labeler/tagger." [R. 127–28].  The ALJ concluded that Claimant was not disabled from July 21, 2015 through October 30, 2017. [R. 128].

The ALJ's step four and five findings that Claimant is "unable to perform any past relevant work" and that "there are jobs that exist in significant numbers in the national economy that the claimant can perform" were buttressed by testimony from VE Vercillo during Claimant's hearing. [R. 126–27].  As stated by the ALJ with respect to step four,

> [i]n comparing the demands of the claimant's past relevant work to the residual functional capacity, the vocational expert testified that the claimant's work as a hospital housekeeper exceeds the exertional limitation and her work as a cashier required contact with the public.  The claimant is therefore unable to perform any of her past relevant work as actually or generally performed.

[R. 127].  At step five, the ALJ stated:  "Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." [R. 128].

The information VE Vercillo was given during the hearing regarding Claimant's "mental abilities" did not include mention of any deficits in intellectual functioning. [R. 18–59].  As asked by Claimant's counsel during the hearing, "we talked about the fibromyalgia, we talked about the pain, we talked about the depression, anxiety, the panic attacks, talked about your shoulder and the weakness and the fatigue, is there anything we missed?  Anything that you want

to talk more about that the [ALJ] should be aware of?").  [R. 51].  Claimant responded, "I have, nothing else, okay."  [R. 52].

In summary, Claimant was denied disability status because steps three and four of the ALJ's analysis were decided against her.  At step three, the ALJ determined she "[did] not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1," (analyzing Claimant under Listings 1.02, 1.04, 12.04, and 12.06).  [R. 105].  And at step five, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the claimant can perform," [R. 127], based on VE Vercillo's hearing testimony that someone like Claimant could hypothetically "work[] more with data or things as opposed to . . . people or in a retail or a commercial setting."  [R. 55].

### F.     New Evidence of Intellectual Disability

On Nov. 7, 2018, approximately one year after the ALJ issued his denial of Claimant's appeal, Claimant saw psychologist Dr. Mascoop upon referral from Claimant's counsel.  [R. 64].  Dr. Mascoop's CV indicates that she is a licensed psychologist and health services provider and has been in practice for over twenty years.  [R. 10].  She has varied experience in providing diagnostic assessments and evaluations and has been doing them for over a decade.  [Id.].  The purpose of Dr. Mascoop's appointment with Claimant was to evaluate whether Claimant had a psychological impairment as defined by SSA regulations and, if so, to offer an opinion on whether the impairment would interfere with her ability to work.  [R. at 64].  Dr. Mascoop diagnosed Claimant with Recurrent Severe Major Depressive Disorder, Panic Disorder, and Mild Intellectual Disability, the last of which was a new diagnosis.  [R. at 69].

With regard to "Assessment Procedures," Dr. Mascoop's report lists the following: clinical interview, review of medical records, Test of Nonverbal Intelligence-third edition (TONI-3); Peabody Picture Vocabulary Test-Hispanic American Adaptation; Developmental Test of Visual-Motor Integration; Beck Depression Inventory, second edition, Spanish translation; and Beck Anxiety Inventory, Spanish translation.  [R. at 64].

In a sub-section labelled "Behavioral observations/mental status," Dr. Mascoop concludes that "[d]uring testing, [Claimant] appeared to apply a good level of effort and did not give up when test items were too difficult for her. . . . Based on her motivation and cooperation, the results of this evaluation are felt to be valid and to accurately reflect [Claimant's] Cognitive and emotional functioning."  [R. 65].

The report, in another sub-section labelled "Background information," says that

> [Claimant] reported that she completed eighth grade "late" and could not explain why she did not continue in school.  [Claimant] did not recall if she had learning difficulties in school but stated that she had problems "remembering questions." She added, "I feel I'm still the same way.  I try to concentrate but I'm still not getting it."  [Claimant] tried to complete a GED in the U.S. three times, including in Spanish, and said that based on her scores she was not even close to passing.

[R. 65].  As to "medical conditions," Dr. Mascoop's report mentions that Claimant had "[n]o reported history of head injury" and "[n]o reported history of substance abuse."  [R. 66].

The "Assessment Results" section of Dr. Mascoop's report states that Claimant's performance on the TONI-3 test "was at the 1st percentile with a Quotient (estimated IQ) of 64." [R. 67].  Claimant's results on a test measuring word comprehension (presumably, the Peabody Picture Vocabulary Test-Hispanic American Adaptation, though Dr. Mascoop's report does not say so explicitly) "place her below the 1st percentile with an estimated vocabulary level of an eight or nine [sic] and a standard score (estimated verbal IQ) of 60."  [Id.].

With regards to "summary and diagnostic formulation," Dr. Mascoop opined that "[d]iagnostically, the results of this evaluation are consistent with depressive disorder, panic attacks, and Intellectual Disability.  She reported that she had difficulty in school 'remembering questions,' finished eighth grade 'late' and was unable to pass the GED three times, even when taken in Spanish."  [R. 68].

In a sub-section labelled "Diagnosis/SSA," Dr. Mascoop opined that "[Claimant] meets the SSA criteria for Intellectual disability as evidenced by her performance on a measure of intellectual functioning (TONI-3) that fell in the Extremely Low range (estimated IQ of 64) which is in the 1st percentile."  [R. 68].

### G.    Appeals Council Review

Claimant timely submitted a request for Appeals Council review of the ALJ's decision and submitted additional evidence in support of her request, including Dr. Mascoop's November 2018 report.  [R. 1–2].  The Appeals Council denied her request for review on May 29, 2019, finding "no reason under [SSA] rules to review the Administrative Law Judge's decision."  [R. at 1].  On July 17, 2019, Claimant filed a complaint with this Court, seeking review of the Commissioner's decision pursuant to § 205(g) of the Act.  [ECF No. 1].

## II.    STANDARD OF REVIEW

### A.    Judicial Review of the ALJ's Decision

This Court has jurisdiction pursuant to Section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court.  See 42 U.S.C. § 405(g).  The district court may take various actions with respect to the Commissioner's decision.  First, under sentence four of Section 205(g), the court has the power "to enter, upon

the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id.  A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner.  See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)).  If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it: "[i]f additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g).  Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992) (Kane, J., concurring).  Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration.  See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under Section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo.  Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.").  Substantial evidence means "'more than a mere scintilla.

It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The Court "must affirm the [Commissioner's] resolution, *even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## B.    Judicial Review of the Appeals Council's Decision

The Appeals Council need not articulate its reasons for refusing to review an ALJ's decision, but if the Appeals Council articulates an egregiously mistaken ground for their refusal, a reviewing court can correct that mistake.  Mills v. Apfel, 244 F.3d 1, 5–6 (1st Cir. 2001); Chigas v. Colvin, No. 15-cv-00457, 2016 WL 3166419, at *4 (D.N.H. June 6, 2016) ("The [First Circuit] has 'assume[d] that the Appeals Council's refusal to review [is] effectively unreviewable if no reason [is] given for the refusal.'  On the other hand, however, 'an Appeals Council refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for this action.'" (internal citation omitted) (quoting Mills, 244 F.3d at 5–6)).

The First Circuit has explicitly confirmed that the "egregious error" standard applies in "Social Security cases where new evidence is tendered after the ALJ decision." Mills, 244 F.3d at 5.  The "egregious error" standard is "far more deferential" to the Appeals Council than the "supported by substantial evidence in the record" standard which courts use to evaluate an ALJ's decision in the Social Security disability context.  See 42 U.S.C. § 405(g); Orben v. Barnhart, 208 F. Supp. 2d 107, 110 (D.N.H. 2002).

### III.     DISCUSSION

Claimant advances three reasons why the Commissioner's final decision should be reversed or remanded: 1) the Appeals Council improperly dismissed Dr. Mascoop's new evidence of claimant's intellectual disability; 2) the ALJ failed in his step three duty to determine whether Claimant's severe fibromyalgia met or equaled an Appendix 1 listing; and 3) the ALJ failed to consider whether the combined effects of Claimant's mental and physical impairments render her disabled.  [ECF No. 12 at 7–20].  The Commissioner asserts that the Appeals Council properly determined that Claimant's post-decision submissions were not material, that substantial evidence supports the ALJ's determination that Claimant's fibromyalgia did not meet or equal any listing, and that the ALJ properly considered the combined effects of Claimant's impairments.  [ECF No. 16 at 4–20].

### A.     Appeals Council's Failure to Review New Evidence

Claimant contends that the Appeals Council failed to recognize that, despite the date of Dr. Mascoop's report, her conclusions regarding Claimant's intellectual disability were necessarily retrospective because there is a presumption of early onset for intellectual disability.  [ECF No. 12 at 15–17].  The Commissioner argues that Dr. Mascoop's report did not include a retroactive finding.  [ECF No. 16 at 14].

The Appeals Council's notice denying Claimant's request for review of the ALJ's decision referenced Dr. Mascoop's report relating to Claimant's intellectual capabilities, which was submitted after the ALJ hearing and decision, in one paragraph:

> You also submitted . . . a psychological evaluation report dated November 7, 2018 from Susan Mascoop, Ed.D. (6 pages), and a curriculum vitae for Dr. Mascoop (5 pages). The Administrative Law Judge decided your case through October 30, 2017. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before October 30, 2017.

[R. 2].  The Appeals Council made clear that the reason it found the additional information did

not affect the ALJ's decision was because it did not relate to the period at issue.  See id.

At the outset and guided by the principle announced in SEC v. Chenery Corp., 332 U.S.

194 (1947), the Court is not required to affirm the Appeals Council under a rationale that the

Appeals Council did not articulate itself.  "[A] reviewing court, in dealing with a determination

or judgment which an administrative agency alone is authorized to make, must judge the

propriety of such action solely by the grounds invoked by the agency."  Id. at 196; see Citizens

Awareness Network, Inc. v. United States, 391 F.3d 338, 349 (1st Cir. 2004) ("It is a bedrock

principle that a court may only uphold an administrative action on a rationale advanced by the

agency in the administrative proceeding."); Palombo v. Berryhill, No. 17-cv-00284, 2018 U.S.

Dist. LEXIS 105418, at *14 n.6 (D.N.H. June 25, 2018) ("[A]bsent any explanation by the ALJ,

the Acting Commissioner's argument . . . appears to be no more than a post hoc rationalization of

what occurred below."); Gilbert v. Colvin, No. 14-cv-00553, 2015 WL 3755118, at *6 (D.N.H.

June 16, 2015) ("[I]t is not for the Acting Commissioner to make arguments in support of the

ALJ's decision that the ALJ did not make.").  The Court will therefore limit its review of the

Appeals Council's decision to the reason articulated in the notice itself, namely whether Dr.

Mascoop's report related to the time period at issue.

Dr. Mascoop diagnosed Claimant with an intellectual disability, which for purposes of

SSA disability analysis is described in Listing 12.05.  [R. 69].  Per Listing 12.05, a diagnosis of

intellectual disability requires "evidence about your current intellectual and adaptive

functioning and the history of your disorder that supports the conclusion that the disorder began

before you attained age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(H)(4).  On the date

of Dr. Mascoop's examination, Claimant was 53 years old.  [R. 65].  In order to meet Listing

12.05's "early onset" requirement, Dr. Mascoop's report had to contain a retrospective analysis, which it did.  Dr. Mascoop referenced Claimant's difficulties in school, multiple failed attempts to pass a GED exam, as well as recent testing results that demonstrated low IQ.  [R. 65, 67].  Further, nowhere in the record is there an indication that Claimant suffered a traumatic brain injury or similar event that could account for late-in-life changes to her intellectual capacity.  See [R. 66] ("No reported history of head injury.")

Courts apply a presumption "for purposes of meeting the longitudinal [onset prior to age 22] requirement of Listing 12.05(c), that a person's IQ remains fairly constant throughout life absent evidence indicating that the person suddenly became mentally [disabled]."  Sturtevant v. Barnhart, No. 04-cv-00188, 2005 WL 1353727, at *4 (D. Me. June 7, 2005), report and recommendation adopted at No. 04-cv-00188, 2005 WL 1530238 (D. Me. June 27, 2005); see also Mace v. Astrue, No. 08-cv-00014, 2008 WL 4876857, at *3 (D. Me. Nov. 11, 2008), report and recommendation adopted at No. 08-cv-00014, 2008 WL 5412293 (D. Me. Dec. 24, 2008) (adopting rebuttable presumption that IQ remains fairly constant throughout life); Teves v. McMahon, 472 F.Supp.2d. 82, 87 (D. Mass. 2007) ("[Intellectual disability] is, absent major trauma to the head . . . a congenital condition which has no 'onset' date").  Given the presumed stability of intellectual functioning, the Commissioner's argument which posits that, even assuming Claimant met Listing 12.05 in November 2018, she did not meet the listing requirements before October 2017, is therefore unavailing.

In Chigas v. Colvin, a claimant provided the Appeals Council with a "Headaches Medical Source Statement" and a "Headaches Residual Functional Capacity Questionnaire," completed by a physician after the ALJ issued his decision.  2016 WL 3166419, at *5.  On the RFC questionnaire, the physician indicated that the claimant's headaches first became severe years

before the ALJ's decision, and that he had been seeing the claimant about once a month since the onset of these headaches.  Id. at *2.  The Appeals Council denied the claimant's request for review because the "new information [was] about a later time" than the date the ALJ decided his case and "[t]herefore [] [did] not affect the decision about whether [the claimant was] disabled beginning on or before [the ALJ's decision date]."  Id. at *3.

The Chigas court noted that, like here, the Appeals Council's decision was not based on its evaluation of the weight or materiality of the new evidence, but was instead "based upon its determination that the new evidence pertained to a time period after the date of the ALJ's decision."  Id. at *4.[6]  The court then reviewed the new evidence submitted and concluded that some of the physician's statements had a "retrospective character" that reached back before the ALJ's decision date.  Id.  In light of that finding, the Chigas court stated that the claimant's case "st[ood] apart from those on which the Acting Commissioner relie[d], where the evidence the Appeals Council declined to consider had no retrospective quality."  Id.

Similarly, in Brennan v. Barnhart, a claimant submitted new evidence to the Appeals Council after the ALJ issued a decision.  No. 05-cv-00123, 2006 WL 217987, at *2 (D. Me. Jan. 25, 2006), report and recommendation adopted at No. 05-cv-00123, 2006 U.S. Dist. LEXIS 4523 (D. Me. Feb. 6, 2006).  The Appeals Council denied review of the ALJ's decision and noted that the newly submitted evidence concerned a later period of time.  Id.  The court found that "[i]n

---

[6] In Chigas the court was interpreting the previous versions of § 416.1470(a)(5) and § 404.970(a)(5), which did not require that additional evidence submitted to the Appeals Council have a reasonable probability of changing the outcome of the decision.  Nevertheless, the court rejected the Commissioner's argument on this ground.  2016 WL 3166419, at *5 ("More importantly, while the Acting Commissioner now argues that Chigas's new evidence was not reasonably likely to have caused the ALJ to reach a different decision, the Appeals Council did not say that, and the court is not inclined to affirm the Appeals Council under a rationale that the Appeals Council did not articulate itself.").

stating that all of the new information was 'about a later time,' the Appeals Council was egregiously mistaken." Id.  The newly submitted evidence was found to have related to the claimant's condition during the relevant time period and the case was remanded to SSA for reconsideration of the merits of claimant's case.  Id. at *3.

Like Chigas and Brennan, the instant case involves the Appeals Council's rejection of additional evidence because it "d[id] not relate to the period at issue."  See [R. 2].  Given that intellectual disability is presumed to have an onset prior to age twenty-two, retrospective evidence of the Claimant's intellectual capacity is relevant, particularly in light of Dr. Mascoop's references to Claimant's history of intellectual disability in her report.  See, e.g., [R. 65 (referencing review of Claimant's medical records in support of report), 66 (discussing Claimant's report of having difficulties in school and her inability to pass the GED despite three attempts), 69 (discussing results of IQ testing)].[7]  The Appeals Council committed an egregious error when it erroneously concluded that the new retrospective evidence pertained exclusively to a time after the ALJ's decision.  See Chigas, 2016 WL 3166419, at *5; Brennan, 2006 WL 217987, at *2.  Because the Appeals Council articulated an egregiously mistaken ground for their refusal to review the ALJ's decision, the Court finds that remand for further consideration of Dr. Mascoop's report is appropriate.  See Mills, 244 F.3d at 5–6.  The Court makes no judgement as to the impact of this evidence, but directs that it be considered.

**B.     The ALJ's Failure to Evaluate Claimant's Fibromyalgia at Step Three**

Claimant contends that the ALJ did not explicitly reference her fibromyalgia or compare it to a listing at step three.  [ECF No. 12 at 12].  The Commissioner states that even though "the

---

[7] The Commissioner incorrectly states that "there is no indication that Dr. Mascoop reviewed any of the plaintiff's treatment records."  [ECF No. 16 at 16].  But see [R. 64 (listing "review of medical records" as part of Dr. Mascoop's assessment procedures)].

ALJ did not explicitly reference fibromyalgia . . . [he] considered relevant physical and mental listings . . . ."  [ECF No. 16 at 4].

After finding Claimant's fibromyalgia to be severe at step two, the ALJ did not mention fibromyalgia by name or reference Claimant's physical symptoms from that diagnosis (e.g., widespread pain) at all at step three.  See [R. 105–09].  Instead, he focused on listings for Claimant's right shoulder injury (1.02), her spinal impairments (1.04), and her depression and anxiety (12.04 and 12.06).  [Id.].  Although fibromyalgia is not a listed impairment, at step three an ALJ must determine whether it medically equals a listing by itself or in combination with another medically determinable impairment.  SSA, SSR 12-2p: Titles II and XVI: Evaluation of Fibromyalgia, 2012 SSR LEXIS 1 (2012).  Social Security Ruling ("SSR") 12-2p states that

> [a]t step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (appendix 1).  [Fibromyalgia ("FM")] cannot meet a listing in appendix 1 because FM is not a listed impairment.  At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

Id. at *16–17.

Courts in this district "differ in the extent to which at step three the ALJ must discuss whether the claimant's severe conditions medically equaled a listing," and the First Circuit has not yet weighed in on this issue.  Arrington v. Colvin, 216 F. Supp. 3d 217, 233 (D. Mass. 2016), aff'd sub nom. Arrington v. Berryhill, No. 17-cv-01047, 2018 WL 818044 (1st Cir. Feb. 5, 2018) (quoting Medina-Augusto v. Comm'r of Soc. Sec., No. 14-cv-01431, 2016 WL 782013, at *8 (D.P.R. Feb. 29, 2016)) (collecting cases).  At a minimum, however, and—as required under SSR 12-2p—an ALJ must compare a claimant's fibromyalgia to a listing at step three.  2012 SSR LEXIS 1, at *16–17.  The ALJ failed to do so.

The Commissioner argues that "there was no specific, required listing the ALJ needed to consider." [ECF No. 16 at 5]. Nevertheless, the ALJ needed to consider *some* listing with reference to fibromyalgia at step three. See 2012 SSR LEXIS 1, at *16–17. In addition, the Commissioner claims that the ALJ's evaluation of Claimant's medical conditions under Listings 1.02 and 1.04, as well as her mental conditions under 12.04 and 12.06 were relevant to a step three analysis of her fibromyalgia. [Id. at 4]. The ALJ's decision makes clear, however, that references to 1.02 and 1.04 were specific to her right shoulder tear and spinal impairments, not her reported fibromyalgia symptoms. See [R. 105].

"Where, as here, some of the evidence indicates that [claimant] may have met a listing, the ALJ was required to actually evaluate the evidence, compare it to [the relevant listing], and explain his conclusion. The ALJ's failure to include such an explanation is remandable error." Lopez Davila v. Berryhill, No. 17-cv-12212, 2018 WL 6704772, at *16 (D. Mass. Nov. 6, 2018) (citation omitted), report and recommendation adopted sub nom. Davila v. Berryhill, No. 17-cv-12212, 2018 WL 6499862 (D. Mass. Dec. 11, 2018); see also Reynolds v. Comm'r of Soc. Sec., 424 F. App'x 411, 416 (6th Cir. 2011) ("Ultimately, the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments. Put simply, he skipped an entire step of the necessary analysis. He was required to assess whether [the claimant] met or equaled a Listed Impairment (such as the one above), but did not do so."); Smith v. Saul, No. 18-cv-01086, 2019 U.S. Dist. LEXIS 196373, at *14 n.6 (D.N.H. Nov. 13, 2019) (remanding case with instructions to ALJ to use SSR 12-2p to analyze claimant's fibromyalgia in combination with other impairments); Wyman v. Berryhill, No. 4:17-cv-04174, 2018 U.S. Dist. LEXIS 144205, at *64–65 (D.S.D. Aug. 22, 2018) ("As discussed above, fibromyalgia is *not* a Listed impairment. And, the ALJ did not mention or discuss whether it considered fibromyalgia *in*

*combination with* the specifically Listed impairment under consideration when determining whether that Listed impairment met or equaled the listing requirements.  This leaves the court unable to determine whether it considered [the claimant's] severe fibromyalgia impairment *at all* at the step-three level of the sequential evaluation.").

The Court therefore finds that the ALJ's failure to evaluate Claimant's fibromyalgia at step three requires remand.  See Nguyen, 172 F.3d at 35.

### C.      ALJ Did Not Fail to Consider Combined Effects of Claimant's Impairments

As a final ground for relief, Claimant argues that the ALJ failed to evaluate the combined effects of her physical and mental impairments, and instead evaluated her physical impairments separately from her mental impairments.  [ECF No. 12 at 20].  The Commissioner contends that the ALJ acknowledged his obligation to consider the combined effects of Claimant's impairments and did so by reviewing medical records in which Claimant's providers discussed both her mental and physical impairments.  [ECF No. 16 at 8].

An ALJ must "consider the combined effect of all of the individual's impairments," both physical and mental, "without regard to whether any such impairment, if considered separately, would be of such severity" that it could form the basis of eligibility for benefits.  42 U.S.C. § 423(d)(2)(B); see also 20 C.F.R. § 404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."); McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1127 (1st Cir. 1986) ("[V]arious physical, mental, and psychological defects,

each non-severe in and of itself, might in combination, in some cases, make it impossible for a claimant to work.").

Here, the ALJ reviewed Claimant's medical records and physical and mental impairments in detail at pages eleven to twenty-eight of his decision.  [R. 109–26].  Recitation and review of a claimant's medical records for treatment of physical and mental health complaints can be sufficient to meet the requirement of a combined effects analysis.  See Gooch v. Sec'y of Health & Human Servs., 833 F.2d 589, 591 (6th Cir. 1987) (holding that ALJ's use of the word "'impairments' (plural)" after reviewing claimant's medical records was a sufficient indication that the ALJ had considered the combined effects of claimant's impairments); Snow v. Barnhart, No. 05-cv-11878, 2006 U.S. Dist. LEXIS 86225, at *18 (D. Mass. Nov. 29, 2006) (citing Gooch and finding that an ALJ's "comprehensive discussion of [claimant's] physical and mental impairments" fulfilled the required combined effects analysis).

In reviewing Claimant's records in detail, the ALJ "provide[d] adequate explanation to show that he had considered the combined effect of the impairments as to allow proper judicial review."  Smith, 2019 U.S. Dist. LEXIS 196373, at *13–14 (quoting Lavoie v. Colvin, No. 15-cv-00209, 2016 WL 3554963, at *4 (D.N.H. June 24, 2016)).  Although the ALJ did not specifically discuss the impact of Claimant's mental health symptoms on her physical health and vice-versa beyond reviewing her medical records, he satisfied the required analysis.  See Snow, 2006 U.S. Dist. LEXIS 86225, at *18.  Nevertheless, as the case is being remanded, see supra, the ALJ may want to be more explicit in his comparison.

## IV.   CONCLUSION

For the reasons stated herein, Claimant's motion to reverse or remand, [ECF No. 12], is GRANTED in part.  The Commissioner's motion to affirm, [ECF No. 15], is DENIED.  Pursuant

to sentence four of 42 U.S.C. § 405(g), the case is remanded to the Commissioner for further

proceedings consistent with this Order.

**SO ORDERED.**

April 15, 2020                                                      /s/ Allison D. Burroughs
                                                                   ALLISON D. BURROUGHS
                                                                   U.S. DISTRICT JUDGE